NOT RECOMMENDED FOR PUBLICATON
File Name: 24a0217n.06

Case No. 23-1558

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
|  | ) | May 15, 2024 |
| Plaintiff-Appellee, | ) | KELLY L. STEPHENS, Clerk |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
|  | ) |  |
|  | ) |  |
| JAMES EDWARD DENTMOND, | ) |  |
|  | ) |  |
| Defendant-Appellant. | ) |  |
|  | ) | O P I N I O N |

Before: GIBBONS, McKEAGUE, and STRANCH, Circuit Judges.

McKEAGUE, J., delivered the opinion of the court in which GIBBONS and STRANCH, JJ., joined. STRANCH, J. (pg. 12), delivered a separate concurring opinion.

**McKEAGUE, Circuit Judge.** The U.S. Sentencing Guidelines recommend a sentence enhancement whenever the defendant makes a credible threat of violence while committing a drug-related crime. During a traffic stop that uncovered evidence of drug trafficking, James Dentmond told his co-conspirator not to talk to the police. As it turns out, Dentmond had a history of physically and sexually abusing that co-conspirator. The district court decided that Dentmond's statement—viewed in the context of his history of abuse and the circumstances of the stop—constituted a credible threat of more violence if his co-conspirator cooperated with law enforcement. It therefore applied the enhancement. Finding no clear error, we **AFFIRM**.

**I.**

In March 2022, Michigan law enforcement received tips that James Dentmond was trafficking in drugs. On April 1, police pulled over Dentmond's vehicle in northern Michigan. Sergeant John Belonga approached the vehicle and observed that both Dentmond and his sole passenger—Heather Brown—seemed nervous. In particular, Brown was breathing rapidly. Sergeant Belonga asked Dentmond to sit in the patrol car, and Dentmond complied.

More police arrived at the scene. One trooper approached Brown, who was sitting alone in Dentmond's car. He noted that Brown was "extremely nervous, which was observable through her uncontrollable shaking." Incident Rep., R.71-4 at PageID 176. Another trooper guided a drug-sniffing dog around the vehicle. When she saw the dog, Brown appeared "panic-stricken." *Id.* The dog signaled the presence of narcotics, and Brown denied knowledge of any drugs. She stepped out of the vehicle and police started searching the car.

Nearly an hour into the vehicle search, Sergeant Belonga offered to let Brown stand closer to his patrol car so she could "be together" with Dentmond. Video Ex. F, R.84 at 1:00:23–1:00:50. Brown stood next to Dentmond and, under his breath, Dentmond told her to "say nothing." Video Ex. G, R.84 at 1:00:23–1:02:15. Less than a minute later, Brown walked away and asked a nearby trooper if she could wait in his patrol car.

Brown eventually consented to a search of her person. When police found narcotics in her bra, Brown apologized and said that she "could not say anything" in front of Dentmond. Incident Rep., R.71-1 at PageID 164. She then handed over more drugs that were hidden in her pants. Brown apologized again and reiterated that she could say nothing in Dentmond's presence. The trooper conducting the search believed that Brown was afraid of Dentmond. Police arrested them both on state drug charges.

A few weeks later, Brown made a proffer statement to the state authorities. She explained that she and Dentmond had dated intermittently for the past seven years. According to Brown, Dentmond supplied her with heroin to use and other narcotics to sell on his behalf. She also alleged

that Dentmond abused her, providing several specific instances of violence: In August 2021, for example, Dentmond beat Brown so severely with his walking stick that she sought treatment for a head injury. In early September, Brown continued, Dentmond sexually assaulted her with a broom handle. He then held a box cutter to her stomach and threatened to "gut her like a fish." PSR, R.106 at PageID 474 ¶ 42. And on September 11, 2021, Dentmond purportedly threatened to "shoot up" Brown's residence and "kill everything that moves" unless she did what he wanted. *Id.* at PageID 475 ¶ 43.

The state case eventually gave way to federal drug-trafficking charges. In June 2022, a federal grand jury returned a two-count indictment charging Dentmond and Brown with (1) conspiring to possess and distribute controlled substances and (2) possessing controlled substances with the intent to distribute them. Dentmond pleaded guilty to the conspiracy count.

The probation office prepared a presentence report (PSR) to calculate Dentmond's recommended sentencing range under the U.S. Sentencing Guidelines. The PSR included a two-level enhancement that applies if "the defendant used violence, made a credible threat to use violence, or directed the use of violence" during a drug-related offense. U.S.S.G. § 2D1.1(b)(2). To justify that enhancement, the PSR cited Dentmond's statement to Brown ordering her not to speak.[1] It also relied on Dentmond's history of violently abusing Brown. With the enhancement, the guidelines yielded a recommended sentence of 188 to 235 months' imprisonment.

Dentmond objected to the § 2D1.1(b)(2) enhancement. He argued that his statement to Brown during the traffic stop wasn't a threat. He also challenged the PSR's reliance on Brown's abuse allegations, noting several reasons to question Brown's credibility. After all, she made her allegations in a proffer to lessen her criminal culpability. Many of those allegations were

---

[1] The PSR inaccurately described Dentmond's specific words as "shut [your] mouth." PSR, R.106 at PageID 471 ¶ 22. Recorded audio confirms that Dentmond actually said "don't say nothing." Video Ex. G, R.84 at 1:01:15–1:01:18. Dentmond did not object to this discrepancy in district court.

uncorroborated. And, Dentmond added, Brown had recently been removed from a substance-abuse treatment program for engaging in aggressive and controlling behavior.

The district court overruled the objection. It found that Dentmond's statement during the traffic stop—viewed in the context of a violent and abusive relationship—was a threatening "signal" to Brown that "if she didn't continue to try to cover up what was happening, violence would await her." Sentencing Tr., R.136 at PageID 1036. In reaching that conclusion, the court deemed Brown's underlying abuse allegations sufficiently reliable. It cited a September 2021 police report that partially corroborated her proffer statement. It also referenced Brown's apparent fear of Dentmond during the traffic stop, as well as Dentmond's criminal history of assaults and abusive conduct. That evidence, the court reasoned, outweighed Dentmond's concerns about Brown's credibility.

After applying the § 2D1.1(b)(2) enhancement, the district court granted Dentmond's request for a downward variance. It imposed a below-guidelines sentence of 144 months' imprisonment. Dentmond now appeals.

**II.**

Dentmond challenges the procedural reasonableness of his sentence. A sentence is procedurally unreasonable if, among other things, the district court improperly calculated the defendant's guidelines range. *Gall v. United States*, 552 U.S. 38, 51 (2007). When evaluating the district court's sentencing decision, we review its factual findings for clear error and its legal conclusions—including its application of a sentencing enhancement—de novo. *United States v. Pineda-Duarte*, 933 F.3d 519, 522 (6th Cir. 2019). The district court's reliability determinations are reviewed for an abuse of discretion. *United States v. Moncivais*, 492 F.3d 652, 658 (6th Cir. 2007).

**III.**

Dentmond contends that the district court erred by applying the § 2D1.1(b)(2) enhancement. That enhancement kicks in when "the defendant used violence, made a credible threat to use violence, or directed the use of violence" in the course of committing a drug-related offense. U.S.S.G. § 2D1.1(b)(2). More specifically, the "credible threat" clause—on which the district court relied—applies if the defendant credibly communicated his intent to injure another without acting on that threat. *Pineda-Duarte*, 933 F.3d at 522.

To support his challenge, Dentmond raises two primary arguments. First, he argues that the district court erred by relying on Brown's underlying abuse allegations. He next claims that, viewed in the appropriate context, his statement during the traffic stop wasn't a threat. Given the deferential standard of review in play, we disagree on both counts.[2]

**A.**

We start with the threshold question of whether the district court erred in accepting Brown's abuse allegations. The alleged abuse, after all, contributed to the court's ultimate decision that Dentmond made a credible threat of violence during the traffic stop. Dentmond contends that Brown's statements shouldn't have been considered.

He faces a steep hill. District courts enjoy "broad" and "largely unlimited" flexibility in the information they can consider at sentencing. *United States v. Graham-Wright*, 715 F.3d 598, 601 (6th Cir. 2013) (quoting *United States v. Tucker*, 404 U.S. 443, 446 (1972)). Neither the Federal Rules of Evidence nor the Confrontation Clause apply. *Id.* Indeed, sentencing courts may

---

[2] Dentmond also argues that Brown's allegations of violent abuse—even if true—cannot independently support a § 2D1.1(b)(2) enhancement under the "used violence" clause. He reasons that the alleged domestic violence fell outside the charged drug-trafficking conspiracy's scope. But the district court didn't rely on the domestic abuse as evidence that Dentmond "used violence" in the course of his crime. Rather, it cited the violent abuse to support its finding that Dentmond's traffic-stop statement was a "credible threat" to use future violence. Because we affirm on that ground, we need not address this argument.

consider virtually anything as long as the information "has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a); *United States v. Johnson*, 732 F.3d 577, 583 (6th Cir. 2013). That reliability threshold is a "relatively low hurdle" and demands nothing more than "some evidentiary basis beyond mere allegation in an indictment." *Johnson*, 732 F.3d at 583 (emphasis omitted) (quoting *Moncivais*, 492 F.3d at 659).

The district court cleared that hurdle. It did not rely uncritically on Brown's abuse allegations; rather, it identified several parts of the record supporting the allegations' reliability: a corroborating police report, a trooper's observation that Brown seemed afraid of Dentmond, and Dentmond's criminal history.

Most notably, a September 2021 police report corroborates Brown's allegation that Dentmond threatened to "shoot up" her residence on September 11, 2021. The report documents a 911 call about a possible domestic disturbance at Brown's residence. According to the anonymous caller, a man appearing to match Dentmond's description was threatening to "shoot up" the place and "kill everything that moves." Dispatch Rep., R.108-1 at PageID 522 (cleaned up). That language mirrors Brown's account of the incident, and we've previously credited similar police reports as indicia of reliability. *See United States v. Al-Cholan*, 610 F.3d 945, 955 (6th Cir. 2010).

Other parts of the record lend additional support to Brown's abuse allegations. A trooper's written report observed that Brown appeared frightened of Dentmond during the traffic stop. And as the district court noted, Dentmond's criminal record shows a pattern of assaultive and abusive conduct. He has a lengthy history of assault convictions spanning from 1978 to 2005, plus a domestic-violence conviction for punching his then-girlfriend. Granted, Dentmond's criminal past is a weak indicator of his more recent behavior. But the district court merely used it as one extra datapoint to buttress its conclusion that Brown's abuse allegations were reliable. *See United States v. Jones*, 815 F. App'x 870, 876, 880 (6th Cir. 2020) (suggesting that a decades-old conviction can

"support the veracity" of other allegations, even if the conviction isn't itself sufficient to establish a sentencing enhancement's factual predicate). Taken together, the district court's considerations clear the undemanding "sufficient indicia of reliability" standard. *See Moncivais*, 492 F.3d at 659 (declaring co-conspirator's largely uncorroborated proffer statement reliable because it was detailed and "internally and externally consistent").

Dentmond disagrees. He emphasizes several reasons why, in his view, Brown wasn't a reliable source of information. For example, she made her allegations in a proffer while seeking leniency for her criminal role. And she later engaged in aggressive and controlling behavior at her substance-abuse treatment program. Dentmond also contests the level of corroboration in the record: The September 2021 police report is unhelpful, he claims, because police didn't arrest him or even find a gun. Plus, the government failed to produce any medical records showing that Brown sought treatment for her alleged injuries.

These arguments, though reasonable, do not show that the district court abused its discretion in considering Brown's statements to be reliable. True, co-conspirators' proffer statements can be "suspect." *Id.* (citation omitted). The district court here acknowledged as much. But it reasonably decided that the above-described indicia of reliability—including corroborating evidence—overcame the problem. *See United States v. Milan*, 398 F.3d 445, 457 (6th Cir. 2005) (authorizing sentencing courts to consider co-conspirators' proffer statements); *Moncivais*, 492 F.3d at 659–60 (rebuffing claim that co-conspirator's proffer statement was inherently unreliable). And given the "great deference" we afford district courts' credibility judgments, Dentmond's other credibility-based attacks fall short. *See United States v. Esteppe*, 483 F.3d 447, 452 (6th Cir. 2007).

Relatedly, we are unpersuaded by Dentmond's efforts to discredit the corroborating evidence. Sentencing courts need not identify airtight corroboration before crediting allegations. Instead, the question is whether a source of information—here, Brown's proffer—bears at least some indicia of reliability. *See, e.g.*, *United States v. Rice*, 844 F. App'x 844, 847 (6th Cir. 2021)

(explaining that the "low reliability threshold" is satisfied by "at least some corroborative relevant details"). The district court crossed that threshold with the September 2021 police report and other supporting information. No additional evidence was needed.

**B.**

Next, we turn to the district court's credible-threat conclusion. The court found by a preponderance of the evidence that Dentmond made a credible—albeit implicit—threat of violence when he ordered Brown not to speak at the traffic stop. We see no clear error in that factual finding. And given that finding, the § 2D1.1(b)(2) enhancement was appropriate.

To start, we reject Dentmond's argument that the district court reversibly erred by relying on the PSR's inaccurate description of his traffic-stop statement. On appeal, Dentmond highlights a discrepancy between the PSR and video footage of the traffic stop: the former recounted his statement as "shut [your] mouth," yet the latter reveals that Dentmond actually said "don't say nothing." *See supra* note 1. But Dentmond never objected to the PSR's characterization in district court. In fact, his lawyer repeatedly told the court—both in a written sentencing memorandum and during the sentencing hearing—that Dentmond said "shut your mouth." Because Dentmond failed to place that issue into dispute, the district court was entitled to rely on the PSR. *See United States v. Poulsen*, 655 F.3d 492, 512–13 (6th Cir. 2011); *see also* Fed. R. Crim. P. 32(i)(3)(A).

Regardless, the district court's reasoning didn't hinge on the specific wording that Dentmond used when he told Brown to keep quiet. Rather, the court performed a context-sensitive analysis based on Brown's fearful demeanor during the traffic stop, her statements to officers expressing her inability to reveal information in front of Dentmond, and her claims that Dentmond had violently abused her in the past. Officers at the traffic stop described Brown's extreme nervousness and uncontrollable shaking. Some evidence, the court added, suggested that Brown specifically feared Dentmond—especially after he told her not to say anything. Brown separated herself from Dentmond when he made the purportedly threatening statement. And she repeatedly

told the police that she "could not say anything" in front of him. Incident Rep., R.71-1 at PageID 164. One trooper even noted that Brown appeared afraid of Dentmond. Providing important context to this interaction, Brown alleged that Dentmond had a history of violently threatening and abusing her. Given those facts, the court read into Dentmond's 'don't talk' order—irrespective of its specific wording—a threatening and credible "signal" of more violence if Brown disobeyed. *See* Sentencing Tr., R.136 at PageID 1036. Put differently, the court found that Dentmond's words carried an implicit 'or else' threat of violence if Brown cooperated with law enforcement.

Dentmond suggests that the record paints a different picture. Nervousness during a traffic stop is hardly unusual, he notes—especially for someone hiding illicit drugs. In his view, Brown's conduct didn't show that she felt threatened. After all, he argues, nobody forced her to stand next to him. She had no audible reaction to his purported threat. And Brown stuck around for over thirty seconds after the "don't say nothing" comment before walking away. Brown's choice to walk away, Dentmond adds, didn't necessarily indicate fear: it was cold outside, and she may have just wanted to warm up in a heated police car. Finally, on Dentmond's telling, his statement could have merely represented well-intentioned legal advice.

To be sure, Dentmond's interpretation of the facts is a perfectly plausible one. But that doesn't mean the district court clearly erred. In light of the record as a whole—including the abuse allegations and a trooper's explicit observation that Brown seemed afraid of Dentmond—the district court's conclusion was not clearly erroneous. *Cf. United States v. Lira-Salinas*, 852 F. App'x 860, 861 (5th Cir. 2021) (per curiam) (affirming district court's choice to apply § 2D1.1(b)(2) despite the defendant's objection that his statement "was not inherently threatening and that the circumstances establish that it was simply a cautionary warning to a friend"). When multiple permissible views of the evidence exist, "the factfinder's choice between them cannot be clearly erroneous." *United States v. Miller*, 73 F.4th 427, 431 (6th Cir. 2023) (quoting *United States v. Navarro-Camacho*, 186 F.3d 701, 708 (6th Cir. 1999)).

Pushing back, Dentmond turns to our decision in *United States v. Pineda-Duarte*—the sole Sixth Circuit case discussing § 2D1.1(b)(2)'s "credible threat" clause. 933 F.3d at 522. But *Pineda-Duarte* doesn't help him. There, the defendant swung a shovel in the direction of a police officer. The district court applied the § 2D1.1(b)(2) enhancement, reasoning that swinging a shovel qualified as a credible threat of violence. *Id.* at 520–21. We disagreed, deeming the "credible threat" clause a poor fit. After all, nothing in the district court's factual findings suggested that the defendant "expressed" (verbally or otherwise) an intent to violently swing his shovel, but then did not act on that intent. *Id.* at 522. The better question, we concluded, was whether the defendant actually "used violence" when he swung the shovel. We remanded for further factfinding on that issue. *Id.* at 525. This case, however, is different. Unlike in *Pineda-Duarte*, the district court here found that Dentmond signaled an intent to violently harm Brown if she disobeyed his order to remain silent.

Finally, Dentmond argues that other circuits' "credible threat" cases tend to involve far more overt threats of violence. He cites several examples drawn from an appendix that *Pineda-Duarte* helpfully created. *Id.* at 526 app. (collecting cases); *see, e.g.*, *United States v. Lewis-Zubkin*, 907 F.3d 1103, 1104 (8th Cir. 2018) (per curiam) (applying enhancement when the defendant said her co-conspirators "needed to be assaulted" and then paid someone to carry out those assaults); *United States v. Torres*, 694 F. App'x 937, 942 (5th Cir. 2017) (applying enhancement to a defendant who threatened a drug-debtor at gunpoint).

We understand Dentmond's point. But we don't read those cases—or *Pineda-Duarte*—to suggest that threats must be explicit or obvious to outsiders. Context matters. And some cases acknowledge that in the proper context, otherwise benign statements or actions can qualify as "credible threats." *See, e.g.*, *United States v. Kirk Tang Yuk*, 885 F.3d 57, 81, 82–83 (2d Cir. 2018) (holding that the district court reasonably "inferr[ed] a threat" when the defendant said things that could be interpreted as "innocent hyperbole" and also used inmates to relay seemingly benign messages to an incarcerated co-conspirator). Granted, the statement in this case requires more

context than most. But then again, it is an unusual case given Brown's statements that she didn't feel free to speak in front of Dentmond, the officers' observations during the traffic stop, and the history of domestic abuse alleged to pervade the pair's relationship. In light of that context, the district court did not clearly err in finding that Dentmond made an implicit yet credible threat. Accordingly, it properly applied the § 2D1.1(b)(2) enhancement.

**IV.**

For the foregoing reasons, we **AFFIRM** the district court's judgment.

**JANE B. STRANCH, Circuit Judge, concurring.** I concur in the majority opinion and write separately to briefly emphasize two ways in which the specific posture and circumstances of this case bear on our evaluation of Dentmond's "don't say nothing" statement to Brown.

First, the applicable standard of review is integral to our affirmance. The lynchpin of this case is the district court's factual finding that Dentmond made a credible threat, a determination that we review for clear error. Our conclusion that the district court did not clearly err in its factfinding does not indicate whether, under a less deferential standard of review, we would agree that Dentmond's statement in fact constituted a credible threat of violence.

Second, the majority rightly highlights the variety of sources supporting the district court's conclusion that Dentmond made a credible threat of violence. Those sources include Brown's allegations about Dentmond's history of threatening violence and physically abusing her, Dentmond's previous assault and domestic-violence convictions, Brown's repeated statements that she could not say anything in front of Dentmond, and an officer's observation that Brown evidenced fear of Dentmond. This "context," as the majority puts it, is vital to our affirmance—even under the deferential standard of review described above.